**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Case No. 19-cr-0075 (ECT/HB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Otis Ray Mays, Jr., | |
| Defendant. | |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Defendant Otis Ray Mays, Jr.'s Motion to Suppress Statements [Doc. No. 32] and Motion to Suppress Evidence [Doc. No. 33]. The motions were referred to this Court for report and recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a)(3)(A). For the reasons set forth below, the Court recommends that Mays's motion to suppress evidence be denied and his motion to suppress statements be granted in part and denied in part.

## I.    Introduction

In October 2017, the Federal Bureau of Investigation ("FBI") and the Bloomington Police Department were engaged in a joint investigation of Mays's alleged involvement in a theft-by-swindle scheme. (*See* Gov't Mot. Hr'g Ex. 2, Affidavit of Richard A. Waller ("Waller Aff.") ¶¶ 6–7.) The FBI and the Richfield Police Department were separately investigating Mays for alleged involvement in juvenile sex trafficking, beginning in about December 2017. (*Id.* ¶ 9.) On July 23, 2018, the FBI learned of and

obtained a laptop that belongs to Mays ("the laptop") from Mays's uncle, Bernard

Holmes. (Mot. Hr'g Tr. at 14, 16–17 [Doc. No. 52].) The FBI did not have a search

warrant for the laptop at that time, but obtained a warrant two weeks later. (*Id.* at 21;

Gov't Mot. Hr'g Ex. 2.) The search yielded numerous video files that the Government

alleges are child pornography. (*See* Indictment at 1–2 [Doc. No. 1].)

On March 13, 2019, Mays was arrested and interviewed by two FBI agents while

he was in custody. (*See* Gov't Mot. Hr'g Ex. 1 ("Mays Interview").) There is no dispute

that Mays was advised of and waived his *Miranda* rights at the beginning of the custodial

interrogation. During the interview, however, Agent Waller told Mays he could be

subject to additional criminal charges if he lied by omission in declining to answer

questions. In addition, the FBI agents did not stop the interrogation despite Mays's

sporadic refusal to answer questions.

Mays moves to suppress the evidence obtained from the search of the laptop and

the statements he made to the FBI agents. He contends: (1) the seizure and detention of

the laptop without a warrant violated the Fourth Amendment; (2) the affidavit submitted

in support of the search warrant for the laptop did not set forth adequate probable cause[1];

(3) the FBI agents did not honor Mays's assertion of his right to remain silent; and

(4) Agent Waller's suggestion that Mays could be prosecuted for invoking his right to

---

[1] Mays also originally sought suppression of evidence seized from the laptop on the
ground that Agent Waller made material misrepresentations and intentionally omitted
material facts that would have called into question the existence of probable cause if they
had been included in the affidavit. That basis for suppression was contingent on Mays's
request for a *Franks* hearing, which the Court denied in an Order dated May 24, 2019
[Doc. No. 41]. Mays's appeal of that decision [Doc. No. 46] remains pending.

remain silent invalidated his waiver of his *Miranda* rights.  (*See* Def. Mem. Supp. Mots. Suppress [Doc. No. 48].)  The Government opposes both motions.

The Court held a hearing on the motions on May 28, 2019.  Mays filed a memorandum in support of the motions to suppress on June 11, 2019 [Doc. No. 48]; the Government filed a memorandum in opposition to the motions on June 21, 2019 [Doc. No. 55]; and Mays filed a reply memorandum on June 26, 2019 [Doc. No. 56].  The Court took the motions under advisement as of June 26, 2019.

## II.    Motion to Suppress Evidence

### A.    Facts

On July 23, 2018, FBI Special Agent Travis Yarbrough and Bloomington Police Detective Caroline Kne interviewed Bernard Holmes.  (*See* Gov't Mot. Hr'g Ex. 3 ("Holmes Interview").)  The interview covered many topics, and the Court will recount only the relevant details here.

Holmes had become concerned about Mays's activities when one of the alleged victims of the theft-by-swindle scheme told him that Mays had defrauded her of $600,000.  (Holmes Interview 13:27.) [2]  Holmes said he had spoken to many women affected by Mays's misrepresentations of himself as an attorney and one woman who told Holmes that Mays had "raped" her.  (*Id.* at 13:22, 13:33.)  Holmes sought to acquire the

---

[2]  Pinpoint citations refer to the original timestamps contained within the video file recording of the interview submitted into evidence by the United States.  Mays graciously provided a transcript of the interview which greatly assisted the Court.  (Def. Mot. Hr'g Ex. 1A.)  Nevertheless, all quotations represent the Court's understanding of the words spoken in the interview.

laptop because he "fel[t] bad for" the victims and, "selfish[ly]," because Mays had swindled Holmes out of an SUV and a rent-for-deed agreement.  (*Id.* at 13:31, 14:07.) Holmes believed that the laptop would contain evidence of fraud that could help the victims.  (*See id.* at 13:31, 14:04–14:06.)  Holmes never spoke with law enforcement about his plans to take the laptop before he took it.  (Mot. Hr'g Tr. 15–16.)

Holmes had previously allowed Mays to live at a house leased by Holmes, although Holmes himself was not living there at the time.  (Holmes Interview at 13:22, 14:09.)  At some indeterminate point, Holmes asked Mays to move out, but Mays was never formally evicted.  (*Id.* at 13:20, 13:42.)  In April 2018, neither Holmes nor Mays was living at the house, though Mays' personal effects were still there.  (*Id.* at 14:07– 14:09.)  Mays was actually in jail at the time.  (*Id.* at 14:14.)  Holmes went through Mays's room and found the laptop.  (*Id.* at 14:06.)  He took it and kept it at his house for the three months before the interview.  (*Id.*)

After taking the laptop, Holmes searched it.  (*Id.* at 14:14).  He told Detective Kne and Agent Yarbrough that he found videos of women having sex, recorded by Mays, and saved in a folder labeled "Evidence."  (*Id.* at 14:14–14:15.)  Holmes also told the officers that Mays's former girlfriend previously had told him that Mays was selling the videos to his friends and had threatened to "destroy" her with them.  (*Id.* at 14:15.)

Holmes told Detective Kne and Agent Yarbrough that he had been contacted several times by an individual who identified himself as a police officer and who told Holmes that he needed to return the laptop to Mays.  (*Id.* at 14:07, 14:22.)  Holmes told the caller he did not have it.  (*Id.* at 14:07.)  Holmes thought Mays might have been

behind the calls. (*Id.* at 14:22.) According to a police report dated July 13, 2018, Minneapolis Police Officer Troy Schoenberger called Holmes and asked if he knew anything about the laptop. (Def. Mot. Hr'g Ex. 2.) Holmes said he did not have it and did not know anything about it. (*Id.*)

During the interview, Agent Yarbrough asked Holmes if he would give them the laptop, and Holmes readily agreed. (*Id.* at 14:07.) Immediately following the interview, Holmes drove to his home, followed by Agent Yarbrough and Detective Kne in a separate car. (Mot. Hr'g Tr. at 16–17.) Holmes went into the house, retrieved the laptop, and gave it to Agent Yarbrough. (*Id.* at 17.) The laptop was not logged into the Bloomington Police Department's evidence and inventory system, but was retained by the FBI. (*Id.*)

Detective Kne later learned that Mays had reported the laptop stolen to the Minneapolis Police Department, but she did not take steps to determine the status of the report. (Mot. Hr'g Tr. 20–21.) After Holmes gave the laptop to Agent Yarbrough, it remained in FBI custody for two weeks. (Waller Aff. ¶ 22.) On August 7, 2018, Agent Waller submitted a search warrant application and affidavit to United States Magistrate Judge Becky R. Thorson in support of a search warrant authorizing a search of the laptop. (*Id.*) Waller's affidavit detailed, *inter alia*, Holmes' interview, how Holmes and the FBI had obtained possession of the laptop, and the videos and folders on the laptop Holmes had seen. (Waller Aff. ¶¶ 19–22.)

Agent Waller further averred in his affidavit that Mays and a gang called the "Black P Stone Nation" were trafficking four juveniles, aged 11 to 17, in commercial sex.

(*Id.* ¶ 10.)  One of those juveniles, "SD," told Agent Waller in an interview on January 3, 2018, that she was "sold in commercial sex" and that Mays had "mentioned making money by 'prostituting' her."  (*Id.* ¶ 13.)  Through photographs, SD correctly identified Mays and other persons who Agent Waller previously suspected to be involved in the sex trafficking operation.  (*Id.* ¶ 9.)  Based on SD's description of the operation, Agent Waller identified her as the "bottom" of the operation, meaning she was responsible for participating in commercial sex and recruiting others.  (*Id.* ¶ 13.)  SD told Agent Waller that Mays had nonconsensual sex with her, recorded them having sex, and downloaded sexual images of her onto a laptop, though she believed the laptop belonged to another individual involved in the sex trafficking operation.  (*Id.* ¶¶ 14–16.)  SD stated that Mays also had sex with another minor, "AMO," and may have sold her for commercial sex.  (*Id.* ¶ 18.)  SD's account was detailed, including specific quotes, persons, places, and times where alleged events took place.  (*Id.* ¶¶ 9, 13–16, 18.)

Agent Waller detailed an interview of another woman, "Ms. Jackson," who claimed that Mays attempted to sexually assault her.  (*Id.* ¶ 24.)  Agent Waller was aware of five active orders for protection filed by women in the greater Minneapolis area.  (*Id.*)

Agent Waller further averred that a forensic examination of digital media seized and searched pursuant to a separate search warrant yielded messages in which Mays discussed commercial sex trafficking, as well as "videos of . . . consensual sex and dozens of similar photographs."  (*Id.* ¶ 8 (internal quotation marks omitted).)  The forensic investigator did not opine whether the videos and photographs depicted minors. Finally, Waller noted that Mays had voluntarily provided a video recording to Richfield

police in which he discussed commercial sex trafficking with another individual allegedly involved in the operation.  (Waller Aff. ¶ 12.)

Based on the above information, Waller believed Mays used the laptop "to maintain images, videos, and other data involving commercial sex acts, commercial sex trafficking of juveniles, money laundering, and the production of child pornography." (Waller Aff. ¶ 23.)  Magistrate Judge Thorson issued the search warrant on August 7, 2018.

### B.    Discussion

Mays argues that the evidence seized from the laptop should be suppressed as a fruit of an unlawful seizure and detention because the police knew the laptop had been stolen.  Mays also argues that the search warrant was not supported by probable cause.

### 1.    The Initial Seizure of the Laptop Fell Within the Private Actor Exception to the Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.  "Warrantless searches are presumptively unreasonable."  *United States v. Karo*, 468 U.S. 705, 717.  The Fourth Amendment's protections, which apply to both searches and seizures, "proscrib[e] only governmental action."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  The Fourth Amendment "is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'"  *Id.* at 113-14 (quoting *Walter v. United States*, 447 U.S. 649,

662 (1980) (Blackmun, J., dissenting)).  When assessing whether a seizure was conducted

by a private actor, the Court considers three factors: "whether the government had

knowledge of and acquiesced in the intrusive conduct; whether the citizen intended to

assist law enforcement or instead acted to further his own purposes; and whether the

citizen acted at the government's request."  *United States v. Smith*, 383 F.3d 700, 705

(8th Cir. 2004).

In the instant case, Holmes initially seized the laptop.  The government had no

knowledge of or acquiescence in the seizure of the laptop when Holmes removed it from

Mays's room in April 2018.  Holmes did not inform law enforcement of his plans to take

the laptop, nor did he seize the laptop at an officer's request.  Rather, Holmes took the

laptop to help the victims of Mays's alleged theft-by-swindle scheme and for his own

selfish reasons.  The Court finds that Holmes was a private actor when he took the laptop.

Mays next contends that Holmes did not have the authority to give the laptop to

Yarbrough because he had acquired it by theft.  (Def. Mem. Supp. Mots. Suppress at 12;

Def. Reply Mem. at 2.)  Mays relies on *Illinois v. Rodriguez*, 497 U.S. 177 (1990).  In

*Rodriguez*, the Supreme Court held that a law enforcement officer may enter a dwelling

upon invitation of a person she "reasonably believed . . . had the authority to consent"

even if that belief was mistaken.  *Id.* at 188.  But *Rodriguez* is simply too factually and

legally distinct to apply here, pertaining to the validity of consent to search a dwelling,

not whether a private actor can provide stolen evidence of potential crimes to the police

without violating the Fourth Amendment.

Even assuming that Holmes was wrongfully in possession of the laptop, his status

as a private actor means that his procurement of the laptop, whether "innocent or deliberate . . . reasonable or unreasonable," does not violate the Fourth Amendment. *Jacobson*, 466 U.S. at 115. Not only does "a wrongful search or seizure conducted by a private party . . . not violate the Fourth Amendment," but "such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." *Walter v. United States*, 447 U.S. 649, 656 (1980) ("[T]here was nothing wrongful about the Government's acquisition of the packages or its examination of their contents to the extent that they had already been examined by third parties."); *see Jacobsen*, 466 U.S. at 114, 119 (finding that an officer's "viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment," even though the private actor's conduct "might have been impermissible for a government agent"); *United States v. Highbull*, 894 F.3d 988, 992–93 (8th Cir. 2018) (affirming a district court ruling that a cell phone stolen by a private actor from the defendant's car and then given to police was admissible under the private actor exception); *United States v. Knoll*, 116 F.3d 994, 996, 998 (2d Cir. 1997) (finding that the government's continued possession of stolen files was not an illegal seizure). Here, there was nothing wrong with Agent Yarbrough's acquisition of the laptop from Holmes. Agent Yarbrough asked Holmes to provide it, and Holmes willingly did so. Agent Yarbrough knew when he acquired the laptop that Holmes had taken it without Mays's permission, but he did not know that Mays had reported the laptop stolen. Even if he did, however, the Court is not persuaded that such knowledge would have precluded Agent Yarbrough from receiving the laptop from Holmes, especially after Holmes described its contents.

The Court next considers whether the subsequent search by the federal agents was within the scope of the initial private search. *See Jacobsen*, 466 U.S. at 115 ("The additional invasions of . . . privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search."). In *Jacobsen*, employees of a private freight carrier opened a damaged package and examined the contents. *Id.* at 111. They discovered a tube made of silver tape, which they cut open, and which revealed a series of plastic bags, the last of which contained white powder. *Id.* The employees repackaged the contents and called the Drug Enforcement Administration ("DEA"). *Id.* DEA agents arrived at the scene, opened the package without a warrant, took samples of the powder and tested it, and learned that it was cocaine. *Id.* at 112. The Supreme Court determined that the employees' search of the package "might have been impermissible for a government agent," but because they were private actors, their conduct did not violate the Fourth Amendment. *Id.* at 114-15. The Court next concluded that the DEA agents' search did not violate the Fourth Amendment because it did not exceed the scope of the private actors' search. *Id.* at 115. "The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *Id.* at 117. "Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information." *Id.*

Here, Holmes conducted the initial private search. He accessed the contents of the laptop and viewed videos of women having sexual intercourse that had been recorded by Mays and saved in a folder labeled "Evidence." The scope of the FBI's later search of

the laptop did not exceed the scope of the search by Holmes.

Mays next contends that his privacy interest in the laptop was greater than the privacy interest with which *Jacobsen* was concerned.  (Def. Mem. Supp. Mots. Suppress at 10.)  Mays relies on *Riley v. California*, 573 U.S. 373 (2014), in support of his position.  *Riley* does not apply here for three reasons.  First, as discussed above, Mays' expectation of privacy in the laptop had already been frustrated by Holmes' access of the laptop and review of its contents.  Once that occurred, the FBI's subsequent search of the then non-private laptop and its contents did not violate the Fourth Amendment.  Second, *Riley* was expressly limited to searches incident to arrest.  573 U.S. at 395 n.1 ("Because the United States and California agree that these cases involve searches incident to arrest, these cases do not implicate the question whether the collection or inspection of aggregated digital information amounts to a search under other circumstances.").  Third, *Riley* contemplates that once a digital device is seized pursuant to arrest, the officers may retain the device and seek to obtain a search warrant.  *Id.* at 401, 403.  That is what the FBI did here.

The Court concludes that Holmes' seizure and search of the laptop fell within the private actor exception to the Fourth Amendment, that the FBI's acquisition of the laptop from Holmes did not violate the Fourth Amendment, and that the FBI's search of the laptop did not exceed the scope of the initial private search.

### 2.     The Length of the Detention of the Laptop Before the Search Warrant Was Obtained Was Not Unreasonable

Mays next contends that the FBI's detention of his laptop for two weeks prior to seeking a search warrant was unreasonable.  (Def. Mem. Supp. Mots. Suppress at 11–12.)  Both parties rely primarily on two cases from the Eleventh Circuit: *United States v. Laist*, 702 F.3d 608 (11th Cir. 2012), and *United States v. Mitchell*, 565 F.3d 1347, 1357 (11th Cir. 2009).  (Gov't Mem. Opp'n Mots. Suppress at 6–7; Def. Reply at 6–9.)  Both cases recognize reasonableness as the standard to measure the delay between the seizure of an item and the procurement of a search warrant.  *Laist*, 702 F.3d at 612; *Mitchell*, 565 F.3d at 1350–51.

In *Mitchell*, 21 days passed between the date a hard drive was seized from the defendant's home and the application for the search warrant.  565 F.3d at 1349.  The question was whether the length of that detention was reasonable in light of the defendant's possessory interests.  *Id.* at 1350.  The court noted that even though the initial seizure of the hard drive was lawful, "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable searches."  *Id.* (quoting *Jacobsen*, 466 U.S. at 124) (cleaned up).  Reasonableness is measured on a case-by-case basis, considering all of the relevant circumstances pertinent to the private and governmental interests.  *Id.* at 1351 (citations omitted).  The two most relevant circumstances were the paltry reason for the delay offered by the government—that "law enforcement officers simply believed that there was no rush"—and the

significant possessory interest in a computer hard drive, which may be used to "store personal letters, e-mails, financial information, passwords, family photos, and countless other items of a personal nature in electronic form." *Id.* at 1351, 1353. On balance, the court in *Mitchell* found the 21-day delay in applying for the warrant was not reasonable. *Id.* at 1352.

In *Laist*, 25 days passed before a warrant was sought for the defendant's computer, but the court found the length of the detention reasonable. 702 F.3d at 616–17. The court identified the following relevant factors: (1) the impact of the interference on the possessory interest; (2) the length of the delay; (3) whether the owner agreed to the seizure; (4) the government's interest in retaining the item as evidence; (5) the nature of the evidence[3]; (6) the nature of the investigation, including any unusual circumstances; (7) the complexity of the application for the warrant and expected time it should take to prepare; and (8) other evidence of law enforcement's diligence in obtaining the warrant. *Id.* at 613–14 (citations omitted). On balance, the *Laist* court determined that the length of the delay was reasonable.

This Court concludes likewise. First, the impact of the interference on Mays' possessory interest was slight. Mays had already been without the laptop for three months (since April 2018) by the time Holmes gave it to Agent Yarbrough. Mays did not file a police report until July 11, 2018, and he told the officer with whom he filed the report that he had last seen his computer on April 24, 2018, but noticed it was missing on

---

[3] Computers, for example, "are a unique possession, . . . in which individuals may have a particularly powerful possessory interest." *Laist*, 702 F.3d at 614.

July 9, 2018. (Def. Mot. Hr'g Ex. 2.) The two-and-a-half months that passed between the date Mays last saw his laptop and the date he filed the police report are not consistent with a strong possessory interest. Moreover, there is no evidence the laptop contained personal or financial information that was not associated with alleged criminal activity, other than Mays's statement to the police that the laptop contained nude photographs of his girlfriend (Def. Mot. Hr'g Ex. 2). Though Mays claims he had a legitimate possessory interest in the nude photographs of his girlfriend, this is tempered by Holmes's statement to Detective Kne and Agent Yarbrough that the girlfriend had told him Mays was selling the videos to his friends and threatening to destroy her with them.

Second, the nature and scope of the theft-by-swindle investigation took a decidedly sharp and unexpected turn after Holmes' interview. Detective Kne and Agent Yarbrough were investigating Mays only for theft-by-swindle when they learned about and obtained the laptop from Holmes. They were not aware at that time of the commercial sex trafficking investigation that was also underway. Considering the lack of overlap in the investigations, two weeks was not an unreasonable amount of time for Agent Yarbrough to determine there was an active FBI investigation of Mays's involvement in the commercial sex trafficking of juveniles and to communicate with Agent Waller about the information provided by Holmes and the laptop, and for Agent Waller to incorporate that information in the search warrant affidavit. Holmes' account of how he obtained the laptop and his erratic living situation also contributed to the complexity of the investigation.

Third, the length of the delay—two weeks—was not inherently unreasonable and

was less than the delay in both *Mitchell* and *Laist*. Fourth, although Mays did not consent to the seizure, Holmes did, and as discussed above, Holmes had already dispossessed Mays of his privacy interest in the laptop. Fifth, the FBI had a strong interest in retaining the laptop as evidence in both the theft-by-swindle investigation and the commercial sex trafficking investigation.

Two factors are relatively neutral here: the complexity of the warrant application and other evidence of diligence in obtaining the warrant. Though Agent Waller's affidavit was eighteen pages long, only seven pages contained substantive material unique to the laptop. Upon review, the Court finds the warrant application neither complex nor simple. The Court has no evidence of Agent Yarbrough's or Agent Waller's diligence or dilatoriness.

One factor weighs in Mays's favor: that a computer is a unique possession in which an individual may have a powerful possessory interest. This is true for all searches of computers, however, and alone is not sufficient to render the two-week delay unreasonable. Weighing all the factors, therefore, the Court concludes the two-week delay was not unreasonable and did not violate the Fourth Amendment.

### 3.     Probable Cause Existed to Search the Laptop

A search warrant must be supported by probable cause, supported by a sworn affidavit, and must describe with particularity the place to be searched and the items or persons to be seized. U.S. Const. amend IV. The task of a judge presented with a search warrant is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that

contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). As the very term implies, probable cause "deal[s] with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

A court reviewing a previous determination of probable cause must give "great deference" to the issuing judge's assessment. *Id.* at 236 (quotation omitted). If the issuing judge "relied solely on the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999) (quotation omitted).

Mays first challenges probable cause on the ground that Waller's affidavit is based primarily on uncorroborated allegations by SD. (Def. Mem. Supp. Mots. Suppress at 13.) This is not accurate, as the affidavit also describes, *inter alia*, a digital media device that contained videos of consensual sex and a saved chat referring to a "sex trafficking ring," which was previously seized from Mays' residence pursuant to a separate search warrant; a recorded interview Mays had voluntarily given to officers in which Mays and another person discussed "moving into the 'escort' business because 'the pimping game is getting hot;'" and information obtained from Holmes, including that he had viewed videos saved on the laptop of Mays having sex with other individuals. (Waller Aff. ¶¶ 8, 12, 21.)

Moreover, the Eighth Circuit recently determined that the uncorroborated allegations of a juvenile victim of sexual assault can establish probable cause to search

for evidence of child pornography on the perpetrator's computer, cell phone, or digital media devices. *See United States v. Johnson*, 848 F.3d 872, 875, 878 (8th Cir. 2017).

Like the juvenile victim in *Johnson*, SD's statements described events that she personally witnessed or with which she was directly involved. SD said she overheard Mays mention making money by prostituting her. (Waller Aff. ¶ 13.) She identified Mays from a photograph as one of the individuals who had commercially sex trafficked her. (*Id.* ¶ 9.) SD told officers that Mays had recorded with his cellular telephone them having nonconsensual sex and downloaded sexual images of her onto a computer. (Waller Aff. ¶ 16.) This allegation was consistent with the digital media device previously seized by law enforcement and Holmes's statements that Mays saved similar (though consensual and not necessarily depicting minors) images on other digital devices.

Second, Mays argues there was no nexus between his cellular telephone, which SD said contained the illicit photographs and videos, and the laptop. (Def. Mem. Supp. Mots. Suppress at 13.) "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue . . . ." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) In making that determination, a court may draw "reasonable inferences from the totality of circumstances." *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007) (quotation omitted).

Here, after considering all of the allegations in Waller's affidavit, the Court finds a nexus was established between the laptop and the evidence allegedly stored on Mays's cellular phone. First, SD told Waller that she believed Mays had downloaded photographs of her from her cellular telephone to a laptop, although she believed the

laptop belonged to another individual.  (Waller Aff. ¶ 16.)  Second, it is common knowledge that digital files are easily copied and shared between devices.  Third, Holmes told Waller that he had seen on Mays's laptop videos of Mays having sex, as well as a directory labeled "Evidence."  (*Id.* ¶ 21.)  Fourth, Waller explained that in his training and experience laptops are used frequently to communicate with victims and potential commercial sex purchasers, to store and share photographs and videos used to advertise for commercial sex acts, and to backup data created on cellular telephones when the two are synchronized.  (*Id.* ¶¶ 26–27.)  Specific as to this investigation, Waller believed that Mays had used the laptop to communicate with SD, create or store digital images of SD and/or other juvenile victims, or communicate with potential purchasers of commercial sex.

In sum, the Court concludes that the information provided by SD, in combination with the other information described in Waller's affidavit, provided a substantial basis for concluding that there was a reasonable likelihood that evidence of child pornography would be found on Mays's laptop.

## III.    Motion to Suppress Statements

### A.    Facts

Mays was arrested on March 13, 2019, and interrogated by Agent Waller and Agent Yarbrough.  Mays was handcuffed and wearing leg restraints.  Prior to questioning and before the interview room camera was activated, the agents verbally advised Mays of his *Miranda* rights at least twice.  (Mays Interview at 10:42.)  Mays also signed a

document acknowledging and waiving his *Miranda* rights.  (*Id.* at 10:29; Gov't Ex. 4.) [4]
The parties do not contest that Mays was subject to a custodial interrogation and that the
*Miranda* warning was legally sufficient.

The substantive part of the interview began when Mays said, "Let's talk about this
child pornography."  (Mays Interview at 10:29.)  Agent Waller described the general
nature of the child pornography charges to Mays, which Mays denied.  (*Id.* at 10:30.)
Mays asked to see the evidence against him, and Agent Waller declined.  (*Id.* at 10:31.)
Mays then said, "I don't know what you're talking about," and vehemently denied having
sex with a minor.  (*Id.*)  Agent Waller replied, "I think at this point, we need to make it
clear to you that there is a federal statute, that you can be charged with, it's called 1001,
. . . for not being straightforward, honest . . . and lying to federal agents." [5]  (*Id.*)  After
asking Mays not to interrupt, Agent Waller told Mays:

> there's that federal statute, if you are either known to be lying to us or later
> on it's found out that you were untruthful with us, that's one more thing
> that you can be charged with . . . and the U.S. Attorney's Office, unlike the
> state, . . . will aggressively go after just that one statute.

(*Id.* at 10:32.)  Mays responded, "Understandable."  (*Id.*)

Over the next eight minutes, Agent Waller asked Mays about his sexual activity
with minors and his involvement with the alleged theft-by-swindle scheme.  (*Id.* at

---

[4]  Pinpoint citations refer to the original timestamps contained within the video file
recording of the interview submitted into evidence by the United States.  All quotations
represent the Court's understanding of the words spoken in the interview.
[5] This statute criminalizes false statements made to a federal agent or officer.  *See*
28 U.S.C. § 1001(a).

10:32–10:40.)  Intermittently, Mays would answer with "no comment," "I don't want to talk about that," or silence.  Mays also confirmed, however, that he wanted to continue the interview, and he continued to answer questions.  When Agent Waller asked Mays, "So you're saying that you've never taken money from a couple by the name Wehner?," Mays did not respond.  (*Id.* at 10:40.)  At that point, Agent Waller initiated the following exchange:

WALLER:     Otis, here's the thing, the FBI does not ask questions they don't already know the answers to, okay?

MAYS:       I'm aware of that.

WALLER:     We don't.  It would be a waste of everybody's time if we came in here blind asking you things that we are still trying to figure out, you would not be sitting here in cuffs and leg irons if that were the case.

MAYS:       Understand.

WALLER:     We would not have gotten arrest warrants for you if that were the case.

MAYS:       Like I said boss, I'm not gonna bullshit you—

WALLER:     We feel like you are.  We feel like you are, if you are not taking ownership and just keep saying "no comment, no comment" when we already know what the facts are, you're wasting our time.

MAYS:       How?  Did I lie to you?  You asked me not to lie to you, right?

. . .

20

MAYS:            You, matter of fact, said there's a law that I can't lie to you, right?

WALLER:          Here's the thing: *you can also lie through omission*.

MAYS:            I don't even know what the hell that means.

WALLER:          It— [laughter]

MAYS:            [Laughter]—I'm sorry.

WALLER:          —It means you can lie by keeping your mouth shut when we know that you know.

MAYS:            *You told me that I have a right to keep my mouth shut; now, I lie if I keep my mouth shut—*

WALLER:          So now do you need to be Mirandized again?

MAYS:            You Mirandized me twice—[crosstalk inaudible]

WALLER:          Right.

YARBROUGH: At least—

MAYS:            Yeah [laughing] I'm not—boss, listen, I'm not gonna waste your time—

YARBROUGH: —because if you now are refusing to talk

MAYS:            I'm not—

YARBROUGH: Well we feel like you've already lied to us and this is why, we've already got great evidence—

MAYS:            Mm-hmm [affirmative].

YARBROUGH: Okay?

MAYS:        Wait, how did I lie to you, you asked me a question and—

YARBROUGH: Well, because, because you said you didn't have sex with minors, okay?  We know that that's not true, we have evidence that that's not true, so we know that you've already lied to us.

MAYS:        Okay.

YARBROUGH: So I know that, you know, you don't wanna–you're saying that you don't want to lie to us but we know that you already did.  So, you know, let's start there and then try to move forward—

MAYS:        I'm gonna say it again.  I wouldn't answer a question knowing the law you just stated.[6]  If I knew you guys could prove that, I wouldn't have even answered a question.  I'm gonna say it again.  I've never had sex with a minor, period.

(*Id.* at 10:40–10:43 (emphases added).)

The interrogation continued in similar fashion.  Mays continued to answer and decline to answer questions intermittently.  Later, Mays referred to § 1001 again, stating, "Remember, I can't lie, there's a federal statute, I can't lie to you."  (*Id.* at 11:10.)  Later still, prior to an additional interrogation by a third FBI agent, Agent Waller tells Mays that he "doesn't have to talk" if he does not want to.  (*Id.* at 11:17.)  Aside from this, the agents never re-Mirandized Mays or corrected the misimpression that he could be prosecuted for remaining silent.

---

[6]  Mays pointed to Agent Waller when he referred to "the law you just stated."

### B.    Discussion

#### 1.    Mays Did Not Clearly and Consistently Assert His Right to Remain Silent

Mays first argues that his statements during custodial interrogation should be suppressed in their entirety because the FBI agents failed to scrupulously honor his assertion of his right to remain silent.  (Def. Mem. Supp. Mots. Suppress at 7.)  The Eighth Circuit has held that for a defendant to invoke his right to remain silent, the invocation must be clear and consistent.  *United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016) (quotation omitted).  Mays's statements must be "consider[ed] . . . as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent."  *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995).

Mays's assertions were equivocal at best.  At times, he said "no comment" or "I'd rather not talk about that," or just remained silent.  Each of these responses left ambiguity as to whether Mays wished to stop the interview entirely.  Furthermore, in between these statements, Mays talked at length with the agents, and when asked if he wished to continue the interrogation, Mays consistently and unequivocally replied in the affirmative.  The Court finds that Mays did not clearly or consistently invoke his right to remain silent.

#### 2.    Agent Waller's Statement that Mays Could Be Charged with Lying by Omission Rendered Mays's Subsequent Statements Involuntary

Mays argues that his waiver of *Miranda* rights was rendered invalid by Agent Waller's statement that he could be prosecuted under 28 U.S.C. § 1001 for exercising his

right to remain silent.  (Def. Mem. Supp. Mots. Suppress at 6.)

A waiver of a right such as the right to remain silent must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  "The government has the burden of proving the validity of the *Miranda* waiver by a preponderance of the evidence."  *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004).  The issue at hand concerns the second part of the test and whether Agent Waller's statement to Mays that he could be charged with violating § 1001 for lying by omission—in other words, for not answering the agents' questions—affected Mays's understanding of the nature of the right to remain silent and the consequences if he abandoned—or exercised—that right.

Shortly after Mays declined to answer Agent Waller's question about whether he had taken money from the Wehners, Agent Waller told Mays that he could be charged with lying by omission.  Mays's response illustrated his confusion: "I don't even know what the hell that means."  Waller did not attempt to clarify what he meant, but continued, "It means you can lie by keeping your mouth shut when we know that you know."  Mays remained perplexed: "You told me that I have a right to keep my mouth shut; now, I lie if I keep my mouth shut?"  Waller did not confirm or deny Mays' interpretation.

Though *Miranda* does not require a "talismanic incantation" or "verbatim recital" of rights, the warnings may not be misleading or inaccurate.  *See California v. Prysock*,

24

453 U.S. 355, 359–61 (1981); *see also South Dakota v. Long*, 465 F.2d 65, 70 (8th Cir. 1972) (stating "the warnings given must be complete and meaningful to the accused"). The Court finds here that Agent Waller's statements about the nature of the right to remain silent were misleading and that Mays was genuinely confused about the nature of the right to remain silent and the potential legal consequences of invoking that right. Telling Mays that he could be charged with a crime for not answering the agents' questions flatly contradicted his right to remain silent.  *Cf. Hart v. Attorney Gen.*, 323 F.3d 884, 894 (11th Cir. 2003) (determining an agent's statement to defendant that "honesty wouldn't hurt him" contradictory to *Miranda* advisement that statement could be used against him in court); *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991) (finding an agent's comment to defendant that "signing the waiver would not hurt him" a contradiction of the *Miranda* advisement that the statement could be used against him in court, and thus misleading about the consequences of giving up the right to remain silent); *United States v. Dohm*, 618 F.2d 1169, 1175 (5th Cir. 1980) (finding a court's statement "you may say something that might hurt you in future proceedings" misleading and confusing such that *Miranda* waiver was invalid).

Although "*Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings."  *Doyle v. Ohio*, 426 U.S. 610, 618 (1976) (holding that the use of a defendant's silence for impeachment purposes violates due process).  Agent Waller's reference to § 1001 implied that Mays's exercise of his right to remain silent could be penalized with additional criminal charges.  Thus, Mays was faced with a false choice between

25

exercising his right to remain silent or being charged with violating § 1001.  Neither

Agent Waller nor Agent Yarbrough corrected this misrepresentation or re-Mirandized

Mays. Because Agent Waller's statement to Mays that he could be charged with violating

§ 1001 for exercising his right to remain silent impaired Mays's understanding of the

nature of the right to remain silent and implied that Mays could be penalized for

exercising that right, Mays's subsequent statements were not voluntary and the Court

recommends that they be suppressed.


Accordingly, based on the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.  Defendant Otis Ray Mays Jr.'s Motion to Suppress Evidence [Doc. No. 33] be

    **DENIED**; and

2.  Defendant Otis Ray Mays Jr.'s Motion to Suppress Statements [Doc. No. 32]

    be **GRANTED IN PART** and **DENIED IN PART**, as set forth fully above.


Dated: July 23, 2019

   s/ *Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge


**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the
District Court and is therefore not appealable directly to the Eighth Circuit Court of
Appeals.  Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written
objections to a magistrate judge's proposed finding and recommendations within 14 days

after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.