# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.

Otis Ray Mays, Jr.,

        Defendant.

File No. 19-cr-0075 (ECT/HB)

**OPINION AND ORDER
ACCEPTING REPORT AND
RECOMMENTATION**

Defendant Otis Ray Mays, Jr. ("Mays") appeals from Magistrate Judge Hildy Bowbeer's Order denying Mays's motion for a *Franks* hearing and objects to Magistrate Judge Bowbeer's Report and Recommendation ("R&R") to the extent it recommends denying Mays's motion to suppress evidence.  Mays does not object to the R&R insofar as it recommends granting in part and denying in part his motion to suppress statements. Because a motion for a *Franks* hearing is non-dispositive, the May 24 Order is reviewed for clear error.  The Order will be affirmed.  Upon *de novo* review, Mays's motion to suppress evidence will be denied because the private actor exception to the warrant requirement permits government agents to acquire stolen property and use it as evidence against the true owner in a subsequent criminal prosecution.  Further, the 15-day delay between the Government's acquisition of the evidence (a laptop) and its application for a search warrant was not unreasonable, and the affidavit in support of the search warrant application supported a probable cause finding.

# I

Mays is charged with nine counts of production of child pornography and one count of receipt of child pornography. The alleged child pornography was discovered on Mays's personal laptop, which was searched pursuant to a warrant issued by Magistrate Judge Becky R. Thorson on August 7, 2018.

On July 23, 2018, FBI Special Agent Travis Yarbrough and Bloomington Police Detective Caroline Kne interviewed Bernard Holmes, Defendant Mays's uncle and former housemate, in relation to a theft-by-swindle scheme Mays allegedly was running. Gov't Mot. Hr'g Ex. 2 ("Waller Aff.") ¶ 19 [ECF No. 38-1]; Gov't Mot. Hr'g Ex. 3 ("Holmes Interview"). Holmes told Detective Kne and Agent Yarbrough that from approximately October 2017 to April 2018 Holmes and Mays had lived together. *Id.* at ¶¶ 19–20. Holmes and Mays had a dispute in April 2018; the police were called, and Mays was arrested on an outstanding, unrelated warrant. After the dispute, neither Mays nor Holmes lived in that residence. *Id.*

While Mays was in custody pursuant to the unrelated warrant, he left his laptop at the residence the pair had shared. *Id.* at ¶ 21. In April 2018, while Mays was in jail, Holmes returned to the residence, "rifled through" Mays's room, and stole Mays's laptop. *Id.* ¶ 22; Holmes Interview at 1:14:32. Holmes stated in the interview with Agent Yarbrough and Detective Kne that he had seen, on Mays's laptop, videos of Mays having sex with various persons, as well as a directory labeled "Evidence." Holmes Interview at 1:14:35.

On July 11, after getting out of jail and learning that Holmes had taken his laptop, Mays reported the laptop as stolen to the Minneapolis Police Department and identified Holmes as the suspected perpetrator. Def. Mot. Hr'g Ex. 2. Two days later, Minneapolis Police Officer Troy Schoenberger called Holmes and asked about the laptop. *Id.* Holmes said he did not then, nor did he ever, have the laptop, and did not know anything about it. *Id.* Contrary to what he told Officer Schoenberger, Holmes kept the laptop in his possession for the three months after he stole it and before he was interviewed by Agent Yarbrough and Detective Kne. *Id.* at 1:15:56.

During the July 23 interview with Agent Yarbrough and Detective Kne, Holmes stated that he had received phone calls from police officers instructing him to return the laptop to Mays. *Id.* at 1:16. Holmes stated that officers had left messages stating that he needed to return their calls "or else," and Agent Yarbrough suggested that did not sound like a message a police officer would leave. *Id.* Agent Yarbrough and Detective Kne then asked Holmes if he would be willing to surrender possession of the laptop to them. *Id.* Holmes agreed, and Agent Yarbrough and Detective Kne went with Holmes, in separate vehicles, to his residence where he voluntarily provided the laptop. *Id.* The laptop was brought to the Minneapolis FBI Field Office for storage on that same day, July 23, 2018. Waller Aff. ¶ 22. Fifteen days later, on August 7, 2019, FBI Special Agent Richard Waller submitted an 18-page affidavit in support of a search warrant to perform a forensic analysis on the laptop. *See generally id.*

In his affidavit, Agent Waller averred that on October 5, 2017, as part of a separate investigation, the Bloomington Police Department obtained a search warrant authorizing a

search of Mays's home, vehicle, and person. Gov't Mot. Hr'g Ex. 2 ¶¶ 6–7. During this search several digital media devices were discovered, and investigators found sexually explicit videos and images on those devices. *Id.* ¶ 8. Those devices also contained a "chat" between Mays and an individual, in which the individual stated "I'm not in the lifestyle of stripping or selling myself as a part of an attempt to bust a sex trafficking ring." *Id.*

Agent Waller further averred that in December 2017, the FBI received information from the Richfield Police Department regarding sex trafficking of minors. *Id.* ¶ 9. Richfield police had interviewed a minor, SD, who had been identified as a victim of sex trafficking. *Id.* SD identified Mays in a photograph as an individual who "played a role" in her being commercially sex trafficked. *Id.*

Agent Waller stated that on December 12, 2017, he met with Richfield police officers who informed Agent Waller that members of the gang "Black P Stone Nation" were allegedly sex trafficking juvenile girls ranging from 11–17 years old. *Id.* ¶ 10. Mays was allegedly one of the gang members involved in the sex trafficking. *Id.* ¶ 11. During his meeting with Richfield police, Agent Waller viewed a video Mays had provided to the Richfield police. *Id.* ¶ 12. The video was a recording of a conversation between Mays and another alleged gang member, Rafael Hassan. *Id.* Mays and Hassan were discussing "moving away from posting ads on Backpage and moving into the 'escort' business because 'the pimping game is getting hot.'" *Id.*

Agent Waller averred that on January 3, 2018, he, along with two Richfield police officers, interviewed SD. *Id.* ¶ 13. During that interview, SD recalled being sold for commercial sex in an apartment near where Hassan lived. *Id.* SD stated that both Mays

and Hassan had made money by prostituting her. *Id.* SD stated Hassan wanted to "sell her vagina" to the point that she could recruit other girls into the sex trafficking operation. *Id.* SD stated that Mays told her that Mays felt each girl was worth $10,000. *Id.* SD told the law enforcement officers that aside from marijuana, she never received anything of value from Hassan selling her for commercial sex. *Id.*

SD also told Agent Waller that she and Mays had nonconsensual sex on three separate occasions. *Id.* ¶¶ 13–15. SD felt she had no other choice but to have sex with Mays on those occasions. *Id.* ¶ 15. SD stated that Mays had used his cell phone to make video recordings of the nonconsensual sex. *Id.* ¶ 16. Given that SD was a minor at the time, those alleged recordings would constitute child pornography. *Id.* SD also told Agent Waller that Mays requested SD take pictures of herself with her cell phone and send them to Mays from SD's phone. *Id.* SD did not send pictures to Mays; however, SD believed that Mays had downloaded some pictures from SD's phone to a laptop SD thought was owned by Hassan. *Id.* SD also believed that Mays had sex with another juvenile known as AMO, and that AMO may have also been sex trafficked by Hassan and Mays. *Id.* ¶ 18. Agent Waller's affidavit then transitions to assertions regarding Holmes's interview with Agent Yarbrough and Detective Kne, detailed above. *Id.* ¶ 19.

Agent Waller "believe[d] Mays used [the laptop] to maintain images, videos, and other data involving commercial sex acts, commercial sex trafficking of juveniles, money laundering, and the production of child pornography." *Id.* ¶ 23. Agent Waller "also believe[d] Mays used [the laptop] in furtherance of his alleged theft by swindle scheme, which resulted in two victims being defrauded of approximately $305,000." *Id.* Agent

Waller averred that in his training and experience, he "know[s] computers such as laptops are used to communicate with victims, co-conspirators, and potential 'johns' or commercial sex purchasers through text messages, Facebook Messenger, and various other apps." *Id.* ¶ 26. Accordingly, Agent Waller believed the laptop could "include contact information, photographs, text messages, and other communication[s] between the trafficker and victims and commercial sex purchasers." *Id.* Further, Agent Waller "kn[e]w that computers and cellular telephones are used to share photographs and/or videos to advertise (via the Internet) victims for commercial sex acts, often wearing minimal to no clothing, some of which may constitute child pornography. They also may be used to share recorded sex acts as part of the grooming or recruiting process." *Id.* Based on Agent Waller's training and experience, he averred that data created on cell phones can be synced and backed up on laptops, such that the information created on the phone will then be available on the laptop as well. *Id.* ¶ 27. On August 7, 2019, Magistrate Judge Thorson issued a search warrant authorizing a forensic examination of the laptop. Gov't Mot. Hr'g Ex. 2 at 1.

The facts relevant to Mays's Motion to Suppress Statements are detailed clearly and at length in Magistrate Judge Bowbeer's R&R. R&R at 18–22. Briefly, On March 13, 2019, Mays was arrested and interviewed by two FBI agents while he was in custody. Gov't Mot. Hr'g Ex. 1 ("Mays Interview"). Mays was advised of and waived his *Miranda* rights at the beginning of the custodial interrogation. Gov't Mot. Hr'g Ex. 4. During the interview, Agent Waller told Mays he could be subjected to additional charges if he "lie[d] through omission" by "keeping [his] mouth shut[.]" *Id.* 25:26. Agent Waller's assertion

6

seemed to confuse Mays's understanding of his *Miranda* rights, as he responded, "You told me that I have a right to keep my mouth shut; now, I lie if I keep my mouth shut?" *Id.* 25:38. Magistrate Judge Bowbeer recommends suppressing Mays's statements made after this exchange, and no party has objected to this recommendation.

## II

## A

A magistrate judge may be designated to hear and determine any non-dispositive matter pending before the court. 28 U.S.C. § 636(b); Fed. R. Crim. P. 59. Upon timely objection by either party, the district judge must review the magistrate judge's order and set it aside to the extent it is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A); Fed. R. Crim. P. 59(a). A district judge may also refer dispositive matters to a magistrate judge, after which referral the magistrate judge makes recommended findings and rulings. 28 U.S.C. § 636(b)(1)(B); Fed. R. Crim. P. 59(b)(1). Upon timely objection to a report and recommendation of a magistrate judge, the district judge reviews the recommendation *de novo*. 28 U.S.C. § 636(b); Fed. R. Crim. P. 59(b)(3). Motions to suppress evidence are dispositive, and thus magistrate judges offer recommendations as to their disposition. 28 U.S.C. § 636(b)(1)(A); Fed. R. Crim. P. 59(b)(1).

There is a threshold question whether a motion for a *Franks* hearing is dispositive or non-dispositive. Mays argues that such a motion is dispositive, while the Government argues it is non-dispositive. *See* Obj. to Order at 4; Gov't Mem. in Opp'n at 2–5 [ECF No. 54]. Mays cites no cases to support his position that a motion for a *Franks* hearing is dispositive, and his argument relies upon the assertion that "[b]y denying Mr. Mays'

motion for a Franks hearing, the Magistrate Judge by necessity denied his motion to suppress the search on the ground that the affidavit was incomplete and false." Obj. to Order at 5. "Accordingly," Mays argues, "because the Magistrate Judge resolved a motion to suppress by denying the motion for a *Franks* hearing, the court erred by doing so by court order."

"A *Franks* hearing is just a step along the way to the ultimate goal of a motion to suppress[.]" *United States v. Lucca*, 377 F.3d 927, 932 (8th Cir. 2004). As the name of the motion suggests, it is simply a motion to have a hearing, and in deciding such a motion the magistrate decides whether to have a hearing. The confusion stems from the fact that when ruling on a motion for a *Franks* hearing, the deciding judge looks at whether the affidavit supporting the search warrant contained intentional or reckless misstatements or omissions, and whether those misstatements or omissions necessarily affected the determination of probable cause. *See United States v. Gater*, 868 F.3d 657, 659–60 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 751 (2018). That is, the deciding judge rules on whether "the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Id.* Accordingly, when denying a motion for a *Franks* hearing, the magistrate determines either (1) that there were no intentional or reckless misstatements or omissions or (2) that even if the affidavit were corrected to account for the misstatements or omissions, the affidavit could support a finding of probable cause. Crucially, the magistrate judge is not deciding that the affidavit *does* support a finding of probable cause or that, if presented with the corrected affidavit, the magistrate *would* find probable cause.

Multiple cases in this district support the conclusion that a motion for a *Franks* hearing is non-dispositive. *See, e.g.*, *United States v. Guzman*, No. 09-CR-234 (JMR/SRN), 2010 WL 234730 at *13 (D. Minn. Jan. 14, 2010) ("[A] request for a *Franks* hearing is a non-dispositive issue[.]"); *United States v. Balance*, Crim. No. 08-156 (JNE/SRN), 2008 WL 4533999 n.7 (D. Minn. Oct. 6, 2008) (motion for a *Franks* hearing "presents a non-dispositive issue"); *United States v. Adams*, No. CRIM.02-404 (JRT/RLE), 2004 WL 1118587 (D. Minn. May 14, 2004). On the other side of the coin, Mays has provided no cases supporting his position that a motion for a *Franks* hearing is dispositive. Although there are some cases in which a magistrate judge recommends denial of a motion for a *Franks* hearing—rather than ordering denial—this seems to be due to practical considerations, not legal ones. *See, e.g.*, *United States v. McMillan*, No. 17-cr-0290 (WMW/BRT), 2018 WL 2383162 (D. Minn. May 25, 2018); *United States v. Oliver*, Crim. No. 16-258 (DSD/BRT), 2017 WL 187142 (D. Minn. Jan. 17, 2017). That is, it is often more practical and efficient to make multiple recommendations in a single R&R than it is to issue separate R&Rs and orders on a number of motions, even though a magistrate judge has the authority to do so. Further, in some cases in which the denial of a motion for a *Franks* hearing was recommended—not ordered—by the magistrate judge, the magistrate judge simultaneously recommended granting a motion to suppress and therefore denying the motion for a *Franks* hearing as moot. *See United States v. Lussier*, No. 18-cr-281 (NEB/LIB), 2019 WL 1987235 (D. Minn. May 7, 2019); *United States v. Loud*, Crim. No. 17-293 ADM/LIB, 2018 WL 2095606 (D. Minn. May 7, 2018). Because in these cases the motion for a *Franks* hearing was not moot until the motion to suppress was granted, the

magistrate judge could not deny as moot the motion for a *Franks* hearing until the district judge ruled on the motion to suppress. Accordingly, in at least some of the cases in which a magistrate judge recommended denial of a motion for a *Franks* hearing, the magistrate judge could only recommend denial because an order would have been premature.

In the absence of cases supporting his position, Mays argues that by denying his motion for a *Franks* hearing "the Magistrate Judge by necessity denied his motion to suppress the search on the ground that the affidavit was incomplete and false." Obj. to Order at 5. This assertion is expressly contradicted by Magistrate Judge Bowbeer's acknowledgment that "[t]hough the Court is denying Mays' motion for a *Franks* hearing, the Court will reserve formal ruling on the question of probable cause[.]" Order at 6. In denying Mays's motion for a *Franks* hearing, Magistrate Judge Bowbeer did not decide that the affidavit did support a finding of probable cause. Accordingly, "a request for a *Franks* hearing is a non-dispositive issue," *Guzman*, 2010 WL 234730 at *13, and Magistrate Judge Bowbeer's May 24 Order will be set aside only if it "is clearly erroneous or contrary to law." 28 U.S.C. 636(b)(1)(A).

### B

"A ruling is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been committed. A decision is contrary to law when a court fails to apply or misapplies relevant statutes, case law or rules of procedure." *Smith v. Bradley Pizza, Inc.*, 314 F. Supp. 3d 1017, 1026 (D. Minn. 2018) (internal citations and quotation marks omitted).

In accordance with controlling precedent, Magistrate Judge Bowbeer assessed whether Mays had made the "substantial preliminary showing that (1) the affiant omitted facts with the intent to mislead the issuing judge, or omitted the facts in reckless disregard of the fact that the omissions would mislead, and (2) the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Gater*, 868 F.3d at 659–60; Order at 4. As Magistrate Judge Bowbeer applied the relevant law in determining whether to grant Mays's motion for a *Franks* hearing, the May 24 order was not contrary to law. *See Bradley Pizza, Inc.*, 314 F. Supp. 3d at 1026.

In his motion for a *Franks* hearing, Mays contended that Agent Waller omitted from the affidavit the following: (1) the FBI and Richfield police were only made aware of SD because Mays brought her to the Richfield police department because he was "concerned that she was being trafficked for commercial sex," Mot. for *Franks* Hr'g at 2 [ECF No. 35]; (2) Mays was the one who brought the information regarding sex trafficking of minors to the Richfield police, *id.* at 2–3; (3) Mays prepared the video of him and Hassan discussing "the pimping game" in an attempt "to collect evidence against [Hassan] on behalf of the Richfield Police Department, *id.* at 3; (4) [Hassan] allegedly sold SD for commercial sex, not Mays, *id.*; and (5) none of the sexually explicit videos found on Mays' digital media devices involved minors, *id.*

Magistrate Judge Bowbeer assumed *arguendo* that Mays had satisfied the first prong of the *Gater* test and determined that "Mays has not shown that if the omitted information were included in the affidavit, probable cause would be absent." Order at 4. In reaching this conclusion, Magistrate Judge Bowbeer addressed each of Mays's arguments in turn.

Order at 4–6.  As to Mays's arguments that Agent Waller omitted that Mays assisted in the Richfield Police Department's sex-trafficking investigation and was concerned that SD was being trafficked for commercial sex, Magistrate Judge Bowbeer did not clearly err in finding that these omissions did not alter the significance of Agent Waller's averments that "Mays had been personally involved in the alleged commercial sex trafficking of minors, had discussed that involvement with [Hassan] on a video he provided to the police, had nonconsensual sex with SD, a minor, which he video-recorded, and had stored video recordings of sexual acts on his laptop computer."  Order at 4-5.  Further, it was not clearly erroneous to find that "any attempt to portray Mays as acting out of concern for SD's welfare is belied by the averments that Mays forced SD to engage in nonconsensual sex with him three times."  *Id.* at 5.  Nor did Magistrate Judge Bowbeer clearly err in determining that Mays providing information about sex trafficking of minors to Richfield police "corroborated SD's account of sex trafficking."  *Id.*  Mays provided information about sex trafficking to law enforcement; SD said Mays played a role in trafficking her for commercial sex; the fact Mays had information about sex trafficking supports SD's assertion that Mays played a role in sex trafficking.  Magistrate Judge Bowbeer's next finding that Mays's motivations in providing information to the police are not relevant is also not clearly erroneous.  *Id.*  Further, the fact Mays was having conversations with Hassan about sex trafficking at all tends to support SD's statements to law enforcement that both Mays and Hassan played a role in trafficking her for sex.

Magistrate Judge Bowbeer's determination that the affidavit can fairly be read to state "that only [Hassan], not Mays, had trafficked SD for commercial sex" is also not

clearly erroneous, given the affidavit states SD was trafficked in an apartment near where Hassan lived, and that Hassan paid SD in marijuana. *Id.* The finding that "there is no implication that Mays actually trafficked SD for commercial sex," while arguable, is not clearly erroneous. *Id.* The affidavit states SD identified Mays as an individual who "played a role" in trafficking her for sex. Waller Aff. ¶ 9. However, the affidavit does not state explicitly that Mays set up the commercial sex transactions involving SD or participated directly in trafficking SD. "Played a role" is a vague phrase that could mean any number of things. The fact the affidavit identified specifically that SD was commercially trafficked near Hassan's apartment and that Hassan paid SD in marijuana, while not identifying the role Mays played in trafficking SD supports Magistrate Judge Bowbeer's determination. Accordingly, Magistrate Judge Bowbeer's finding that the affidavit contains "no implication that Mays actually trafficked SD for commercial sex" is not clearly erroneous. Finally, Magistrate Judge Bowbeer's determination as to Mays's assertion that Agent Waller omitted that none of the sexually explicit videos found on Mays's devices involved minors was not clearly erroneous. Magistrate Judge Bowbeer correctly found that Agent Waller did not state or suggest that the videos involved minors. Magistrate Judge Bowbeer aptly stated that "[t]he significance of the videos on Mays' devices to the finding of probable cause is that SD, a minor, said that she and Mays had nonconsensual sex three times and that Mays had video-recorded those incidents." Order at 5–6.

Magistrate Judge Bowbeer's May 24 Order was neither contrary to law nor clearly erroneous. Accordingly, Mays's Objection will be overruled, and the Order will be affirmed.[1]

## III

Neither party has objected to Mag. Judge Bowbeer's recommendation that Mays's motion to suppress statements be granted in part and denied in part. While district judges "must consider de novo any objection to the magistrate judge's recommendation," Fed. R. Crim. P. 59(b)(3), they are not required to "review . . . a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings," *Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Leonard v. Dorsey & Whitney LLP*, 553 F.3d 609, 620 (8th Cir. 2009) ("[F]ailure to file objections eliminates not only the need for de novo review, but *any* review by the district court."). Thus, Magistrate Judge Bowbeer's recommendation to grant in part and deny in part Mays's motion to suppress statements will be adopted, and Mays's motion to suppress statements will be granted in part and denied in part.

## IV

Mays makes three arguments to support his motion to suppress evidence. First, Mays asserts that because Holmes stole the laptop, Holmes could not have validly consented to the seizure by FBI Agent Yarbrough because Holmes had no authority to do so. Therefore, Mays asserts that Agent Yarbrough's warrantless seizure of the laptop was

---

[1] The same considerations would lead to affirming the Order on even *de novo* review.

unreasonable.  Second, Mays argues even if the initial seizure was not unreasonable, the 15-day delay in applying for a search warrant was unreasonable and requires suppression. Lastly, Mays argues Agent Waller's affidavit did not establish probable cause, and therefore the search of the laptop was unreasonable.  Each of these arguments fails, and Mays's motion to suppress evidence will be denied.

A

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Warrantless seizures are *per se* unreasonable unless one of the carefully drawn exceptions applies.  *See Coolidge v. New Hampshire*, 403 U.S. 443 (1971).  "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  The Fourth Amendment's protections apply to both searches and seizures, and "proscrib[e] only governmental action; [the protections are] wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'"  *Id.* (citing *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)). In this case, there were arguably two seizures.  First, Holmes's theft of the laptop constituted a seizure, at least once Mays was released from custody and Holmes's continued possession of the laptop "interfere[d] with [Mays's] possessory interests in that property."  *Jacobsen*, 466 U.S. at 113.  Second, the government at least arguably seized the laptop by taking possession of it from Holmes.  The

Government does not contest Mays's assertion that the acceptance of the laptop was a seizure, but case law casts some doubt upon whether Agent Yarbrough and Detective Kne actually "seized" the laptop, or whether they did something else that might be described just as "accepting possession." *See Coolidge*, 403 U.S. 443 (1971).

B

As noted above, the Fourth Amendment protects individuals from unreasonable government searches and seizures. *See Jacobsen*, 466 U.S. at 113. It is uncontested that Holmes himself is not a governmental actor, but his seizure could nonetheless constitute governmental conduct if he was acting as a government agent. *See Burdeau v. McDowell*, 256 U.S. 465 (1921); *United States v. Smith*, 383 F.3d 700, 705 (8th Cir. 2004). The Eighth Circuit has highlighted several factors to consider when determining whether a private citizen was acting as an agent of the government when conducting a search or seizure. *Smith*, 383 F.3d at 705. "Chief among these are whether the government had knowledge of and acquiesced in the intrusive conduct; whether the citizen intended to assist law enforcement agents or instead acted to further his own purposes; and whether the citizen acted at the government's request." *Id.*

Here, none of the factors weigh in favor of a finding that Holmes was a government agent. As to the first and third factors, the government was unaware of Holmes's theft of the laptop, and the government did not request Holmes steal it. Regarding the second factor, Holmes's intent was perhaps to assist law enforcement, given that he thought the laptop might contain evidence of Mays's alleged theft-by-swindle scheme. However, the fact that Holmes waited approximately three months before telling Agent Yarbrough and

Detective Kne about the laptop, and did not even bring the laptop to the July 23 interview, suggests that any intent to aid the government was not at the fore of Holmes's mind when he stole it. Accordingly, Holmes's theft of the laptop was not a government seizure to which the Fourth Amendment's protections would apply.

The second seizure was effected by Agent Yarbrough and Detective Kne when they went with Holmes to his residence to obtain the laptop after the July 23 interview. The parties agree that this was a seizure, but as discussed below, this may not have been a 'seizure' in the Fourth Amendment sense of the word. Even assuming Agent Yarbrough's acceptance of the laptop was a seizure, the private actor exception applies such that Agent Yarbrough did not unreasonably seize the laptop.

In *Burdeau*, the Supreme Court carved out the private actor exception from the Fourth Amendment's warrant requirement. The facts in *Burdeau* are on point, at least to the extent a case from 1921 can contemplate laptops and digital images: "Plaintiff's private papers were stolen. The thief, to further his own ends, delivered them to the law officer of the United States. He, knowing them to be stolen, retains them for use against the plaintiff. Should the court permit him to do so?" *Burdeau*, 256 U.S. at 476 (Brandeis, J., dissenting). Yes. *Id.* (Day, J., writing for the majority).

Here, Mays's laptop was stolen. Holmes, in part to further his own ends, delivered it to Agent Yarbrough. Agent Yarbrough, knowing the laptop was stolen, retained it for possible use against Mays. Accordingly, Agent Yarbrough's seizure of stolen property seems not to offend the Fourth Amendment's prohibition on warrantless seizures, and was not unreasonable. *Burdeau*, 256 U.S. at 476; *see also Bivens v. Six Unknown Named Agents*

*of Fed. Bureau of Narcotics*, 403 U.S. 388, 393 n.6 (1971) (citing *Burdeau* for the proposition that a Fourth Amendment claim can be rejected despite a showing that the federal agents possessed stolen property).

More recently, the Supreme Court has held that "private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." *Walter v. United States*, 447 U.S. 649, 656 (1980). The question, then, is whether Agent Yarbrough acquired the laptop lawfully. Here, as in *Burdeau* and *Coolidge*, there was "not the slightest implication of an attempt on [Agent Yarbrough and Detective Kne's] part to coerce or dominate [Holmes], or, for that matter, to direct [Holmes's] actions by the more subtle techniques of suggestion that are available to officials in circumstances like these." *Coolidge*, 403 U.S. at 487–90.

*Coolidge* seems to support the conclusion that Agent Yarbrough lawfully acquired the laptop because the acquisition was not even a seizure. *See Coolidge*, 403 U.S. at 487–90. In *Coolidge*, the Supreme Court addressed a similar, though distinct, question whether government agents could take possession of guns owned by a defendant, when the guns were offered to the agents by the defendant's wife. *Id.* "The crux of the petitioner's argument must be that when Mrs. Coolidge asked the policemen whether they wanted the guns, they should have replied that they could not take them, or have first telephoned Coolidge at the police station and asked his permission to take them, or have asked her whether she had been authorized by her husband to release them." *Id.* at 489. Here, although Holmes did not outright offer the laptop to Agent Yarbrough and Detective Kne, he freely permitted them to take the laptop off his hands, and had no problem with Agent

Yarbrough and Detective Kne coming with him to his home to take the laptop immediately after the July 23 interview. Agent Yarbrough and Detective Kne did not force Holmes to give them the laptop; Holmes seemed eager to give up the laptop because he felt Mays was "just absolutely crazy" and "just wild out here." Def. Mot. Hr'g Ex. 1A at 46; Holmes Interview at 1:18:20. *Coolidge* ultimately found that the acceptance of the guns by the police was not a seizure at all, because "[t]o hold that the conduct of the police here was a search and seizure would be to hold, in effect, that a criminal suspect has constitutional protection against the adverse consequences of a spontaneous, good-faith effort by his wife to clear him of suspicion." *Coolidge*, 403 U.S. at 490. Certainly, Holmes was not making a good-faith effort to clear Mays of suspicion. However, *Coolidge* seems to stand for the proposition that government agents can accept property not owned by the offeror so long as the agents do not act to coerce the offeror into making the offer. *See id.* at 487–90.

In sum, the private actor exception defined in *Burdeau*, and interpreted and refined in *Walter* and *Coolidge*, permits the Government to take possession of stolen property from a private actor and use that property in a future prosecution so long as the property was not acquired through coercion or other improper behavior. Accordingly, Agent Yarbrough and Detective Kne did not unreasonably seize the laptop.

## C

"[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable seizures." *Jacobsen*, 466 U.S. at 124. "To assess the reasonableness of [the execution of the seizure], we must balance the

nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 124–25; *see also Illinois v. McArthur*, 531 U.S. 326, 331 (2001) ("[R]ather than employing a *per se* rule of unreasonableness, we balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable."). "In assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." *United States v. Maltais*, 403 F.3d 550, 557 (8th Cir. 2005) (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985). "[F]or most people, their computers are their most private spaces." *Clutter*, 674 F.3d at 984. Accordingly, Mays's interest in possession of his laptop was significant. *See also United States v. Laist*, 702 F.3d 608, 614 (11th Cir. 2012) ("[C]omputers are a unique possession, one in which individuals may have a particularly powerful possessory interest[.]").

Mays argues that the 15-day delay between acquiring the laptop and applying for the search warrant was unreasonable and demands suppression. In arguing for their respective positions, Mays and the Government focus primarily on two cases out of the Eleventh Circuit: *Laist* and *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009). In *Mitchell*, the court found that a 21-day delay after seizing the defendant's hard drive was unreasonable. In *Laist*, the court found that a 25-day delay was not unreasonable. In both cases, the Eleventh Circuit focused on a number of factors: (1) the impact of the interference on the person's possessory interest; (2) the duration of the delay; (3) whether or not the owner consented to the seizure; (4) the government's legitimate interest in holding the property as evidence; (5) the nature of the seized property; (6) the nature and

complexity of the investigation; (7) the quality and complexity of the warrant application; and (8) any other evidence proving or disproving law enforcement's diligence in obtaining the warrant. *Laist*, 702 F.3d at 613–614. *Laist* noted that "[t]hese factors are by no means exhaustive, but they are the most relevant when we seek to 'balance the privacy-related and law enforcement-related concerns[.]'" *Id.* at 614 (citing *McArthur*, 531 U.S. at 331).

While not bound to follow the Eleventh Circuit's factors, they seem appropriate and persuasive, especially in the absence of similarly specific guidance on this issue from the Eighth Circuit. Two factors weigh in Mays's favor. First, and most significant, the property seized was Mays's laptop. Multiple courts, including the Eighth Circuit, have noted laptops and computers are unique possessions, capable of containing significant amounts of a person's most private effects. *See, e.g.*, *Clutter*, 674 F.3d at 984; *Laist*, 702 F.3d at 614. Second, the impact of the seizure likely weighs in Mays's favor as well, although not as substantially. Mays was the true owner of the laptop, and as such had a possessory interest in it. However, Mays had been dispossessed of the laptop for three months or so by the time Agent Yarbrough took possession of it, so the additional 15-day delay did not significantly impact Mays's already-diminished possessory interest. On the other hand, Mays had filed a police report about two weeks before Agent Yarbrough seized the laptop. This indicates that Mays was at least trying to recover his laptop and had not abandoned it.

Cutting the other direction, two factors weigh rather significantly in the Government's favor. First, this was a complex investigation involving four separate entities and five investigation teams: Agent Yarbrough's theft-by-swindle investigation,

21

Bloomington Police Detective Kne's concurrent theft-by-swindle investigation, Agent Waller's sex-trafficking investigation, the Richfield Police Department's concurrent sex-trafficking investigation, and the Minneapolis Police Department's investigation of the theft of Mays's laptop. It is not unreasonable that it would take some time for Agent Yarbrough to determine that Agent Waller was also investigating Mays for sex trafficking, and it would likely take even more time for either agent to discover that Minneapolis police were investigating the theft of the laptop. It would also take time for Agent Waller to review Holmes' interview with Agent Yarbrough and Detective Kne, something he clearly did based on the inclusion of information from that interview in Agent Waller's affidavit. Additionally, the fourth *Laist* factor weighs in the Government's favor as the Government had a legitimate interest in holding the property as evidence in both the theft-by-swindle and sex trafficking investigations.

Two factors tilt moderately in favor of the Government's position. First, Agent Waller's 18-page warrant application echoes the complexity of the investigation. Roughly seven pages of the affidavit are facts unique to this warrant application. Those pages include information acquired in two distinct investigations of Mays, and reflect rather complex interrelationships. Further, under the circumstances, there is no evidence that Agent Yarbrough or Agent Waller were dilatory.

Two factors are relatively neutral in this analysis. The duration of the seizure seems not to be dispositive one way or the other. Mays had already been dispossessed of the laptop for three months, and in that sense, an extra 15 days is a relatively minor inconvenience. However, Agent Yarbrough knew Holmes had stolen it, and knew police

officers had been calling Holmes and directing him to return it to Mays. This should have tipped off Agent Yarbrough and Detective Kne that Mays was trying to recover his laptop, even if the law enforcement officers did not know for certain that Mays had filed a police report. The question of consent is also somewhat neutral: Mays clearly did not consent to the seizure, but Holmes, Mays's former roommate and the actual possessor of the laptop, did.

In sum, after "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," the 15-day delay was not constitutionally unreasonable. *Jacobsen*, 466 U.S. at 125.

## D

Lastly, Mays argues Agent Waller's affidavit did not support a probable cause finding. Magistrate Judge Bowbeer's R&R deftly addresses this issue, and the analysis contained in the R&R is adopted. The Supreme Court has "repeatedly said that after-the fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Illinois v. Gates*, 462 U.S. 213, 236 (1983). "Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.*

Agent Waller's affidavit included information learned from a juvenile, SD, who stated she overheard Mays mention making money by prostituting her. Waller Aff. ¶ 13. SD identified Mays from a photograph as a person who had sex trafficked her. *Id.* ¶ 9. SD told officers Mays had recorded the two of them having nonconsensual sex on his cell phone and downloaded the video to a laptop. *Id.* ¶ 16. Although SD told officers she thought the laptop was Hassan's, it is common knowledge that digital files are easily shared between laptops and phones. Further, Holmes had told Agent Yarbrough he had seen videos of Mays having sex with various other individuals on Mays's laptop, although Holmes did not suggest that SD was one of those individuals or that any of the individuals were minors. *Id.* ¶ 21. Holmes had also told Agent Yarbrough there was a folder on the laptop labeled "Evidence." *Id.* Agent Waller further explained that in his training and experience, laptops are commonly used to store and share videos and images to facilitate sex trafficking. *Id.* ¶¶ 26–27. Agent Waller believed Mays had used the laptop to communicate with SD, create or store the sexually explicit images and videos of SD—a minor—and/or communicate with potential purchasers of commercial sex. *Id.* ¶ 23. These averments provided Magistrate Judge Thorson a substantial basis for concluding that a search of Mays's laptop would uncover evidence of wrongdoing, therefore Magistrate Judge Thorson's probable cause finding will not be disturbed.

# ORDER

Based on the foregoing, and on all the files, records, and proceedings in the above-captioned matter, **IT IS HEREBY ORDERED THAT**:

1.  Mays's Objection [ECF No. 46] to Magistrate Judge Bowbeer's May 24, 2019 Order is **OVERRULED**;

2.  Magistrate Judge Bowbeer's May 24, 2019 Order [ECF No. 41] is **AFFIRMED** with the additional analysis provided in this Memorandum;

3.  The Report and Recommendation [ECF No. 60] is **ACCEPTED**;

4.  Mays's Objection [ECF No. 61] to Magistrate Judge Bowbeer's July 23, 2019 Report and Recommendation is **OVERRULED**;

5.  Mays's Motion to Suppress Statements [ECF No. 32] is **GRANTED IN PART** and **DENIED IN PART**, as set forth fully above; and

6.  Mays's Motion to Suppress Evidence [ECF No. 33] is **DENIED**.


Dated:  September 20, 2019          s/ Eric C. Tostrud
                                    Eric C. Tostrud
                                    United States District Court